UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LARAINE AUGUSTINE, Plaintiff, - against - MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, Defendant. | : | **MEMORANDUM DECISION AND ORDER** 11 Civ. 3886 (BMC) |

**COGAN**, District Judge.

Plaintiff brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking an order to vacate the final administrative decision of an Administrative Law Judge ("ALJ") and remand this action solely for calculation of disability benefits. Plaintiff and the Commissioner of Social Security have each filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion is denied, plaintiff's motion is granted, and this case is remanded.

## BACKGROUND

### I. Procedural Background

Plaintiff filed a Title II application for Social Security Disability benefits on December 13, 2002, alleging that she became disabled on September 4, 2002, and indicating that she could not stand or sit for long periods of time and that she could not bend. At the time of her application, plaintiff was forty-one years old. She attended school through the eighth grade. From 1996-2000, plaintiff worked as a food demonstrator at COSTCO. From July of 2000 until her injury in September of 2002, she worked as a sandwich maker at COSI. On the day of her

accident, plaintiff fell exiting the walk-in refrigerator at COSI, hitting her spine on the metal door frame. She was transported to the hospital, where she complained of strong pain in her lower and mid back. As a result of this injury, plaintiff has not worked since the accident and has complained of strong back pain, neck pain, numbness in her extremities, carpal tunnel syndrome, urinary incontinence, knee pain, and major depressive disorder. She visited several doctors for treatment and submitted records to the Social Security Administration ("SSA") detailing these visits.

In February, 2003, the SSA denied plaintiff's claim, finding that she retained the ability to work as a salesperson. Plaintiff appealed and in November, 2004, her application was denied. In August, 2008, the Appeals Council vacated the 2004 decision because two of the physicians relied on by the ALJ, Dr. Khattak and Dr. Ables, had been removed from the SSA's rosters of physicians eligible to perform consultative examinations and testify as medical experts. In November, 2008, and February, 2009, remand hearings were held, and in October of 2009, plaintiff's application was again denied. The Appeals Council declined to review the decision, making the ALJ's decision the final administrative determination. She next commenced this civil action.

## II. Medical Evidence

Over the course of the decade since her accident, plaintiff has been examined by more than ten physicians, all of whom classified her as disabled.[1] This opinion focuses primarily on

[1] The finding of "disabled" by a physician is irrelevant to these proceedings, as disability is a legal question on which doctors have no expertise. Treating physician assessments of "total disability" and in relation to plaintiff's ability to work are not binding on the SSA, see 20 C.F.R. § 404.1504, yet these assessments still "put the ALJ on notice that there were potentially valid opinions relating to the disability of the plaintiff in the Social Security context." Blais v. Astrue, No. 08-CV-01223, 2010 U.S. Dist. LEXIS 57234, at *24 (N.D.N.Y. May 13, 2010), report and recommendation adopted sub nom. Blais v. Comm'r of Soc. Sec. Admin., 2010 U.S. Dist. LEXIS 57243 (N.D.N.Y. June 10, 2010).

the physicians who treated plaintiff longest and who made the most detailed findings regarding her conditions. The physicians who are not discussed made findings consistent with the doctors' opinions described herein.

Plaintiff received treatment from Dr. Paolo Perrone, a primary care physician, beginning immediately after her accident in September, 2002. He diagnosed neck and back pain with upper extremity weakness and hypoflexia. A cervical spine x-ray conducted that month revealed degenerative changes and reversal of the normal spinal curve. He requested and began seeking authorization for a number of diagnostic tests. In October, 2002, plaintiff saw Dr. David Zelefsky, an internist, and complained of severe low back pain radiating to her legs that made her feel as if they would collapse, numbness and tingling in both legs, aggravated pain when sitting, intermittent neck pain, and occasional numbness and tingling in her right hand. Dr. Zelefsky sought MRI and EMG testing. During this visit, plaintiff admitted she had never filled her prescription for Lortab (a narcotic pain reliever) because she could not afford it. Manual muscle testing around the same time revealed decreased muscle strength in both upper extremities and the lower right extremity. A December, 2002, lumbar spine MRI revealed reversal of the spinal curve and moderate bulging of the annular fibrosis at two vertebrae in her lower back. A cervical spine MRI revealed mild ventrical bulging at the two vertebrae in her mid-back as well. Both Dr. Perrone and Dr. Zelefsky determined that these findings were consistent with plaintiff's complaints of severe back pain.

Plaintiff's treatment by these two physicians continued, and in March, 2003, Dr. Zelefsky recommended physical therapy three times a week and advised plaintiff to avoid bending, lifting heavy objects, and prolonged standing or walking, as well as advising use of a cane and lumbar support as remedies to plaintiff's instability on her feet and pain upon standing for long periods.

One month later, at his subsequent examination, he also directed plaintiff to avoid prolonged sitting, due to the pain it caused her to remain seated for more than fifteen minutes. A July, 2003, re-examination by Dr. Perrone documented a decreased range of motion throughout the cervical, thoracic, and lumbar spine associated with severe pain, and diminished motor reflexes and strength.

In February, 2004, after plaintiff delayed seeking treatment hoping her symptoms would subside, she reported to Dr. Zelefsky that since the accident she had been experiencing urinary stress incontinence. She was prescribed Oxytrol. When the Oxytrol produced no effect, she was prescribed Ditropan. In September of 2004, Dr. Zaw Naing, an internist who subsequently became one of plaintiff's primary physicians, diagnosed lower back radiculopathy.

A May, 2005, MRI of the cervical spine led Dr. Naing to diagnose degenerative joint disease and bilateral narrowing of the nerve roots at the lower back. Dr. Naing noted that these findings indicated that the radiculopathy in plaintiff's lower back was worsening and her symptoms were likely to be exacerbated. Because plaintiff complained of knee pain when standing or walking, another MRI was conducted in June, 2005. The MRI revealed the possibility of a small tear of a knee ligament and the beginnings of a popliteal cyst. EMG testing performed in November, 2005, by Dr. Intazam Khan – an independent neurologist who became one of plaintiff's regular physicians – revealed evidence of bilateral carpal tunnel syndrome, radiculopathy at the mid and lower-back, and bilateral median sense neuropathy.

Due to the increased severity of her pain, several physicians recommended that plaintiff undergo carpal tunnel repair surgery in April of 2006. That same month, Dr. Nalini Paddu, an internist and treating physician, reported treating plaintiff for degenerative joint disease of the cervical and lumbar spine, a torn meniscus, and popliteal cyst. She prescribed handrails for

plaintiff's bathroom to assist her in bathing, as plaintiff reported being unable to stand or sit for long enough to bathe properly, and noted that plaintiff had difficulty getting into and out of her shower without assistance from her daughter.

In May, 2006, Dr. Jamie Ullman, a neurosurgeon, conducted a surgical consultation and indicated that she could perform carpal tunnel release surgery. Plaintiff declined to undergo carpal tunnel surgery at that time, fearing that the side effects of the surgery would incapacitate her even further. The following month, Dr. Khan diagnosed plaintiff with a severe spinal cord injury and inflammation of her veins and arteries which, Dr. Khan concluded, would render her unable to work. In October, 2006, Dr. Paddu reported that plaintiff was unable to work for at least twelve months due to fibromyalgia, depression, and internal derangement of the left knee. Dr. Naing concurred in Dr. Paddu's conclusion, also citing bilateral carpal tunnel syndrome, cervical and lumbar radiculopathy, and bilateral knee derangement.

In February, 2007, plaintiff underwent knee surgery to address a suspected ACL tear, and her post-operative report by her surgeon Dr. Karen Wu showed no further tearing. Plaintiff's knee pain did not go away after the surgery, however, and further examinations by Dr. Wu led her to question whether it might be related to plaintiff's back pain and radiculopathy. In August, 2008, plaintiff was diagnosed with osteoarthritis of the knees, cervical and lumbar radiculopathy, bilateral carpal tunnel syndrome, and depression. In September, 2008, Dr. Paddu completed a report indicating that plaintiff could never lift weight, could only sit for zero to one hours in an eight hour day and could stand for zero to one hours in an eight hour day. Dr. Theodore Giannaris, an orthopedic surgeon, concurred the following month, further indicating that plaintiff could not use her right or left hand for grasping, pushing, pulling, or fine manipulations.

## III. Psychiatric Evidence

Due to her constant pain, decreased capabilities, and inability to cook, clean, or shop for herself, plaintiff became depressed in the years following her accident. After discussing these issues with her primary care physicians, she was referred to a psychiatrist. She has been treated for anxiety and depression since May, 2005, when that psychiatrist, Dr. Eduardo Bondoc, who would go on to be her regular psychiatrist, diagnosed recurrent major depression and an anxiety disorder. In July, 2006, Dr. Solomon Mishkin examined plaintiff and diagnosed major depressive disorder. In October, 2006, Mona Nakeley-Fishman, a social worker, completed a functional assessment form indicating plaintiff was unable to work for at least twelve months due to a recurrent major depressive disorder and anxiety disorder.

## IV. Plaintiff's Administrative Hearing

After her case was remanded by the Appeals Counsel, plaintiff appeared before an ALJ with a non-attorney representative on November 13, 2008. She testified that since the ALJ had last heard her case in 2004, the pain had become very severe and she could hardly walk. She also testified that she regularly wore a back brace, a knee brace, hand braces, and a neck brace. During the hearing, plaintiff had to sit and stand at intervals as well as take restroom breaks. She testified that she is forced to wear pads and be near a bathroom at all times due to her incontinence. Plaintiff further testified that she cannot stand or sit for too long due to back pain, that her legs and feet were swollen, and that she cannot hold things in her hands without dropping them. When asked about what activities she can do, she said she tries to sweep or dust, but has to sit down too often to be effective.

The ALJ then heard testimony from Dr. Edward Spindell, an Independent Medical Examiner ("IME") brought in by the ALJ to testify based on the record. As is usually the case

with an IME, Dr. Spindell had not examined plaintiff, and all of his testimony was based on his review of her medical records. Dr. Spindell concluded that no records established severe impairment of the feet, that plaintiff could control her bladder problem with pads and thus it was nonsevere, and that the records did not indicate that her knee problems were severe. He then testified that the MRIs plaintiff underwent showed some localized degenerative changes but no evidence of acute nerve root involvement or foraminal stenosis. Regarding the EMGs performed, he opined that they were consistent with bilateral carpal tunnel, right radiculopathy of the mid and lower back, and a bilateral median sensory neuropathy. Dr. Spindell also testified that no surgery was recommended for plaintiff's wrists to alleviate the effects of carpal tunnel syndrome. He concluded that her neck, back, and hand pain suggested some limitations but would not meet the listings for disability under the Social Security Act. He indicated that she could stand and walk or sit for six out of eight hours; that she could occasionally lift twenty pounds and frequently lift ten pounds; and that she should not climb stairs or ladders and should avoid excessive and repetitive forceful grasping, pushing, and pulling, as well as excessive bending.

Finally, vocational expert Pat Green testified that plaintiff could not perform her past work. The ALJ asked if there were other jobs plaintiff could do considering her limitations, and Green suggested that she might find work as a ticket seller, an assembler of small products, or an assembly machine tender. When told to consider plaintiff's depression and need for low-stress environments, Green eliminated ticket seller as a possible job for plaintiff.

A supplemental hearing was held on February 19, 2009, where plaintiff appeared with counsel. Dr. Spindell testified again, indicating that plaintiff has some degenerative changes to the cervical and thoracic spines and mild scoliosis of the lumbarsacral spine. He concluded that

she does not have an impairment that entitles her to benefits. He opined that she is capable of light activity and that she can lift and carry twenty pounds frequently. This altered his testimony from the earlier hearing, where he had concluded that plaintiff could carry twenty pounds only occasionally and could carry no more than ten pounds frequently. Dr. Spindell also testified that he saw nothing in the record regarding numbness of plaintiff's fingers. He conceded, on examination by plaintiff's counsel, that a person with chronic pain and limitation of motion could not do even the light work he had indicated plaintiff was capable of completing.

**V. The ALJ's Decision**

On October 22, 2009, the ALJ denied plaintiff's application after finding that she was not disabled from September 4, 2002, until the date of the decision. The ALJ gave controlling weight to the testimony of Dr. Spindell, and gave no weight to the opinions of the ten examining physicians insofar as they were inconsistent with Dr. Spindell's testimony. The ALJ disregarded these doctors' conclusions because she found that the functional assessments conducted by these examining physicians bore "no relation to claimant's clinical and objective findings or claimant's activities or daily living." The ALJ stated that she relied on Dr. Spindell's testimony because "the opinion was well explained and he has the appropriate area of expertise." The ALJ gave weight to the psychiatric opinion of Dr. Bondoc, but found that plaintiff's depression was not debilitating enough to be considered disabling.

As the ALJ's decision explained, regulations issued by the Commissioner set forth a five-step evaluation to be used in determining whether a person's impairment meets the standard for providing disability benefits. See 20 C.F.R. §§ 404.920, 416.1520. Pursuant to that evaluation, if an individual demonstrates: 1) she is not engaged in substantial gainful activity; 2) she suffers from a severe impairment (or impairments) that significantly affect her ability to perform work-

related activities; but 3) she does not have any of the impairments in the Commissioner's Listing of Impairments; then 4) she has the burden of demonstrating that she is unable to return to past relevant work. See id. Once the individual has met her burden through those four steps, the burden shifts to the Commissioner to demonstrate that other jobs exist in significant number in the national or local economy that the individual can perform, taking into account age, education, and past work experience. See id. It is the ALJ's duty to investigate and develop the record, including developing arguments for and against granting benefits. See Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004).

During her evaluation of the medical evidence, the ALJ stated that the record did not indicate any side effects from plaintiff's medications. She also noted that Dr. Spindell testified that nowhere in the record was carpal tunnel release surgery ever recommended for plaintiff. The ALJ concluded that plaintiff has lumbar and cervical disc disease and bilateral carpal tunnel syndrome, and that these impairments can be classified as "severe" within the meaning of the SSA Regulations. She further concluded that plaintiff suffered from urinary incontinence, determining that this impairment is "nonsevere" and can be controlled through use of pads and proximity to a restroom. The ALJ determined that plaintiff's knees were not impaired.

While the ALJ gave weight to Dr. Bondoc's psychiatric findings, she disregarded his diagnosis. She found that plaintiff's depression could not be "major depressive and anxiety disorder," as Dr. Bondoc diagnosed, because plaintiff failed to attend many sessions of her weekly therapy. The ALJ concluded this in spite of plaintiff's testimony during her hearing that she often missed therapy due to transportation issues, as she relied on her health provider to supply her transportation to and from therapy.

Examining the case using the required five-step analysis, the ALJ determined that plaintiff met her burden regarding the first four steps. At steps one through three, the ALJ concluded that plaintiff has not engaged in substantial gainful employment since the accident and suffers from impairments that can be characterized as "severe," but that none of these impairments are included in the Commissioner's Listing of Impairments. At the fourth step, the burden was therefore on plaintiff to prove that she cannot return to past relevant work, which the ALJ found was demonstrated through Green's testimony. This shifted the burden back to the Commissioner to display other jobs in the area that plaintiff could perform taking into account her particular situation.

At this fifth step the ALJ found that the Commissioner met his burden of proving that plaintiff retained the ability to perform other work. The ALJ concluded that plaintiff's symptoms were not credible to the extent they were inconsistent with the residual functional capacity ("RFC") assessment related by Dr. Spindell, and determined that plaintiff retained the capacity to perform light work in accordance with vocational expert Pat Green's testimony. The ALJ questioned plaintiff's credibility, ultimately affording her testimony about her level of pain little weight, due to plaintiff's testimony that physical therapy did not alleviate her pain and the ALJ's determination that plaintiff would have discontinued physical therapy if she had not found it beneficial.

## DISCUSSION

### I. Standard of Review

Disability benefits are available to anyone who is deemed disabled as the term is defined in 42 U.S.C. §§ 423(d) and 1382(c). A person is disabled when she displays an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Judicial review of the Commissioner's final decision requires "two levels of inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether correct legal principles were applied. See id.; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standard is grounds for reversal."). Second, the court must decide whether substantial evidence supported the Commissioner's decision. See Johnson, 817 F.2d at 985. The court does not make a *de novo* determination, but undertakes "plenary review" of the record to determine whether there is substantial evidence to support denial of benefits. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (internal quotation marks omitted).

The Social Security Act recognizes a "treating physician rule," which requires the ALJ to afford the opinion of the claimant's treating physician "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence in the record. 20 C.F.R. § 404.1527(d) (2); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). An ALJ who declines to give controlling weight to the treating physicians' medical opinions must give "good reasons" for her decision by considering factors including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998) (citing 20 C.F.R. §

404.1527(d)(2)-(6)). The same factors apply when determining how much weight to give a non-treating medical source. See 20 C.F.R. § 404.1527(f).

Judgment on the pleadings is warranted in favor of plaintiff because the ALJ failed to follow the treating physician rule. This error caused the ALJ to provide the vocational expert with an incorrect RFC. This case must be remanded for the ALJ to provide the vocational expert with the correct RFC. .

## II. The ALJ's Rejection of Treating Physicians' Opinions

A treating physician is defined as a medical professional who can "provide a detailed, longitudinal picture" of medical impairments, as opposed to providing an opinion obtained from "the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2). Dr. Perrone and Dr. Zelefsky treated plaintiff beginning directly after her accident, and each treated her multiple times over the course of more than two years, seeing plaintiff monthly during some periods. Dr. Naing saw plaintiff on several occasions over more than three years. Dr. Khan saw plaintiff for over two years and personally performed one of plaintiff's EMG tests. Dr. Paddu treated plaintiff for over four years, performing multiple diagnostic tests, range-of-motion tests, and muscle strength tests. Dr. Giannaris treated plaintiff most recently, seeing her on multiple occasions in 2008. Each of these doctors are thus "treating physicians" within the meaning of 20 C.F.R. § 404.1527(c)(2).

An ALJ must "give good reasons" for declining to afford controlling weight to a treating physician's opinion. Dwyer v. Apfel, 23 F. Supp. 2d 223, 228 (N.D.N.Y. 1998). A "failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal." Id. A mere contradiction between the opinions of a treating physician and the IME does not

justify an ALJ's decision to discount the treating physicians' opinions. See, e.g., Schaal, 134 F.3d at 505.

Furthermore, relying solely on an IME's opinion is not enough to provide substantial evidence. See id. If an IME's findings are contradicted by substantial evidence in the record and by the treating physicians, any reliance on the IME's findings is questionable and cannot justify the ALJ's decision. See Burgess, 537 F.3d at 131 (an IME's "opinion was flawed" due to a failure to examine evidence, and as a result "the ALJ's reliance on [that] opinion was itself a flaw").In general, an IME's opinion is considered less reliable when treating physicians contradict that opinion; when the IME has "made no mention" of certain evidence; or when the IME seems to have disregarded portions of the record. Kabbas-Linches v. Comm'r of Soc. Sec., No. 05-CV-4853, 2009 U.S. Dist. LEXIS 1975, at *9 (E.D.N.Y. Jan. 13, 2009).

The ALJ relied primarily on the opinion of Dr. Spindell, a non-examining IME, to conclude that plaintiff retained the capacity for light work. Dr. Spindell reasoned that plaintiff could perform light work because she was capable of standing or walking for six out of eight hours; sitting for six out of eight hours; lifting and carrying twenty pounds frequently; and occasionally grasping, pushing, and pulling. This analysis of plaintiff's RFC is inconsistent with plaintiff's testimony; the objective medical evidence; and the opinions of plaintiff's ten examining physicians.

For example, Dr. Spindell's determination that plaintiff could occasionally grasp, push, and pull runs counter to many of plaintiff's treating doctors' opinions. In the months immediately following her injury, Dr. Zelefsky noted that plaintiff had muscle weakness in her hands. The severity of plaintiff's carpal tunnel syndrome was also commented on by Dr. Paddu and Dr. Giannaris, who each separately indicated that plaintiff could not use her hands for any

grasping, pushing, or pulling, or for any fine manipulations. These opinions were supported by objective medical evidence. Two separate EMG tests performed more than two years apart in February, 2003, and November, 2005, indicated bilateral carpal tunnel syndrome. Physicians conducted multiple examinations revealing a Tinel's sign and a Phalen's sign indicating carpal tunnel syndrome, and the EMG testing corroborated those findings. These EMG tests also provided medical evidence of muscle weakness and several treating physicians documented diminished sensation in the digits of both of plaintiff's hands. Muscle weakness in the hands was apparent from early in plaintiff's treatment, even before plaintiff was diagnosed with carpal tunnel syndrome.

Dr. Spindell's conclusion that plaintiff could stand or walk for six out of eight hours; sit for six out of eight hours; and lift and carry twenty pounds frequently also runs counter to many of plaintiff's treating physicians' opinions. For example, Dr. Zelefsky advised plaintiff to avoid bending, lifting anything when she could avoid it, and prolonged standing or walking. Dr. Naing indicated that plaintiff would be unable to stand or sit for more than zero to one hours.[2] Dr. Khan indicated that plaintiff was unable to stand or sit for long periods of time. Dr. Paddu found plaintiff unable to work due to her instability on her feet, her depression, and her problems with her knees. Dr. Paddu also completed a report indicating that plaintiff could never lift weight, could only sit for zero to one hour in an eight hour day and stand for zero to one hour in an eight hour day. Dr. Giannaris reported that plaintiff could sit for zero to one hour in an eight hour day and stand or walk for zero to one hour in an eight hour day. Several of plaintiff's other examining physicians reported findings of decreased range of motion and severe pain that were consistent with their observations and the tests they conducted.

[2] While Dr. Naing indicated that plaintiff could not sit or stand for more than zero to one hours on a disability form he filled out, he was more specific in his notes, indicating plaintiff should not sit or stand for more than fifteen minutes at a time.

Again, all of these opinions were supported by objective medical evidence. Multiple MRIs conducted over the treatment period reflected bilateral radiculopathy of such severity that it limited plaintiff's range of motion and made it difficult for her to sit, stand, or walk for prolonged periods. A cervical spine x-ray revealed degenerative changes and a reversal of plaintiff's spinal curve. Range-of-motion tests conducted by Dr. Zelefsky and Dr. Perrone indicated plaintiff's right and left rotation of her torso was limited to 45 degrees, that she was completely unable to bend, and that she experienced muscle spasms and decreased muscle strength in both her upper and lower extremities. A later range-of-motion test indicated severe restriction in the range of motion of the neck, limiting plaintiff's ability to move her head to within a few degrees in any direction. Additionally, an MRI of plaintiff's knee revealed a possible ligament tear and the beginnings of a popliteal cyst. Five physicians noted plaintiff's limp and use of a cane to get around due in part to her knee pain. X-rays and an MRI conducted after plaintiff's knee surgery indicated signs of arthritis in both knees.

The ALJ did not give good reasons for ignoring the opinions of many of the treating and examining physicians; in fact, none of the factors an ALJ must consider before rejecting a treating physician's diagnosis were mentioned regarding eight of the ten examining physicians. For these doctors, the ALJ dismissed their opinions insofar as they were inconsistent with the testimony of Dr. Spindell, concluding that they bore "no relation to claimant's clinical and objective findings or the claimant's activities or daily living." The ALJ only provided reasons for rejecting the opinions of Dr. Paddu and Dr. Giannaris, and in both cases, no "good reasons" were given.

The ALJ disregarded both Dr. Paddu's and Dr. Giannaris's opinions in part because "the assessments by the two doctors would mean the claimant . . . could not attend the physical

therapy, which the claimant was attending," and could not make it to doctors visits. The ALJ perceived this as an inconsistency between these doctors' diagnoses and plaintiff's demonstrated capabilities. However, it is well established that "an ALJ cannot substitute [her] own judgment for that of a medical professional." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). Dr. Paddu concluded that plaintiff would benefit from physical therapy in light of her diagnosis, and implicitly concluded that plaintiff was capable of attending physical therapy. Dr. Paddu's diagnosis was therefore consistent with plaintiff's demonstrated capabilities, and the ALJ's conclusion that plaintiff would be incapable of attending physical therapy substituted the ALJ's judgment for that of Dr. Paddu. This perceived inconsistency therefore cannot be considered a "good reason" for disregarding the RFC analyses of Dr. Paddu and Dr. Giannaris.

The ALJ disregarded Dr. Giannaris's opinion for four additional reasons: 1) because the RFC analysis completed by Dr. Giannaris was not supported by an objective basis, such as a "range of motion examination"; 2) because he primarily relied on plaintiff's reported complaints; 3) because "the diagnoses Dr. Giannaris stated were for lumbar spine, yet he placed limitations on repetitive use of the hands"; and 4) because he "incorrectly diagnosed osteomyletis of both knees." None of these reasons is a "good reason" for favoring the IME's opinion over Dr. Giannaris's.

First, Dr. Giannaris's RFC analysis was supported by objective evidence including previous range-of-motion examinations; MRIs; EMGs; and tests such as positive straight leg raising. While Dr. Giannaris relied in part on plaintiff's reported complaints of pain, his conclusions were also based on the medical record and his own observations. Second, the ALJ's rejection of Dr. Giannaris's opinion appears to be based in part on a misunderstanding of the medical evidence. The record makes clear that plaintiff's lumbar spine problems likely caused

or contributed to her carpal tunnel syndrome. During her early diagnoses, several physicians indicated that plaintiff's radiculopathy, neuropathy, and carpal tunnel syndrome were potentially interrelated and that all stemmed from nerve root compression. This interrelation lends credence to the diagnoses of Dr. Paddu and Dr. Giannaris who, while looking at the spine, were able to ascertain that plaintiff's spinal problems would also affect her ability to use her hands. The ALJ was therefore incorrect in concluding that Dr. Giannaris's opinion regarding plaintiff's hands was unsubstantiated by his examinations.

Finally, the ALJ rejected the opinion of Dr. Giannaris because he "incorrectly diagnosed osteomyelitis of both knees." While plaintiff was later found to have osteoarthritis of both knees, rather than osteomyelitis, the ALJ should not have disregarded all of Dr. Giannaris' medical opinions based on this one mistake. In fact, "it is permissible for an ALJ to reject certain findings of a provider while affording great weight to others." Carpenter v. Astrue, No. 10-CV-249, 2011 U.S. Dist. LEXIS 101360, at *18 (D. Vt. Sept. 7, 2011). An ALJ cannot "simply reject all evidence from a treating physician because one component of the treating physician's opinions is unsupported." Id. Instead, the ALJ "must weigh all of the evidence and make a disability determination based on the totality of that evidence." Id.

Since none of the ALJ's stated reasons for discounting plaintiff's treating physicians' opinions constitute "good reasons," the ALJ violated the treating physician rule by accepting Dr. Spindell's RFC analysis in favor of the RFC analyses provided by plaintiff's treating physicians. This error was critical to the ALJ's finding that plaintiff was capable of light work.[3]

---

[3] As an additional ground for remand, the ALJ's overreliance on the opinion of Dr. Spindell was improper because Dr. Spindell's opinion was based on an incomplete review of plaintiff's medical records. An IME's medical opinion is considered less reliable if he has ignored or "made no mention" of medical evidence. Kabbas-Linches, 2009 U.S. Dist. LEXIS at *9. Dr. Spindell failed to note much of the medical evidence displaying plaintiff's carpal tunnel syndrome, claiming that the record did not include evidence of muscle weakness or decreased sensation, and commenting, "I don't see anything that she has numbness in any specific fingers or following the distribution, unless I missed it." This evidence existed in the record, as did the evidence that carpal tunnel surgery was considered for

## III. The Vocational Expert's Testimony

The vocational expert at a social security hearing assists the Commissioner in meeting his burden by determining whether there are other jobs in the national or local economy the claimant might perform. See Draegert v. Barnhart, 311 F.3d 468, 469 (2d Cir. 2002). The vocational expert relies on the ALJ's instructions as to the claimant's RFC, as opposed to relying on treating physician reports or the claimant's testimony. See Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983). Here, the ALJ instructed the vocational expert to imagine an individual who could sit, stand, or walk for six out of eight hours; could occasionally engage in repetitive forceful grasping, pushing, or pulling; and could occasionally bend, kneel, stoop, crouch, crawl, and climb stairs. Based on this hypothetical RFC, the vocational expert concluded that plaintiff could perform the jobs of ticket seller, assembler of small products, and assembly machine tender.

Before relying on a vocational expert's testimony regarding other jobs a plaintiff might be able to perform, the ALJ must ask whether the vocational expert's testimony conflicts with the Dictionary of Occupational Titles ("DOT") and the companion job database, Selected Characteristics of Occupations ("SCO"). See Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984). Plaintiff contends that Green's testimony is inconsistent with the requirements of the jobs as set forth in the DOT. Plaintiff argues that the three jobs Green identified exceed the RFC provided by the ALJ because the job of ticket seller requires "constant" handling and reaching, the job of assembler of small products requires "frequent" handling and reaching, and the job of assembly machine tender requires "frequent" reaching. However, the RFC laid out by the ALJ

---

plaintiff (despite Spindell's testimony that "no surgery was recommended"). In spite of these errors and ample record evidence that plaintiff had severe bilateral carpal tunnel, the ALJ accepted Dr. Spindell's assessment that plaintiff could occasionally grasp, push, or pull, and was not limited in fine fingering.

did not include any handling and reaching restrictions; rather, the ALJ advised that plaintiff must avoid "repetitive forceful grasping, pushing, and pulling." The act of reaching is distinct from the acts of grasping, pushing, or pulling. Further, the ALJ's instructions limited plaintiff not from simply "handling," but only from "repetitive forceful grasping." Although "handling" and "grasping" are similar words, the word "grasping" implies a degree of force that does not attach to the word "handling." Moreover, the words "forceful" and "repetitive" modify "grasping," and an individual may easily be capable of "frequent handling" even if she is restricted from "repetitive forceful grasping." See Equihua v. Astrue, No. EDCV 10-0122, 2011 U.S. Dist. LEXIS 8526, *16 (C.D. Cal. Jan. 28, 2011) ("Frequent handling is not the same as 'forceful' handling"). The vocational expert's testimony was therefore consistent with the DOT.

While the vocational expert did not err here, the question remains whether plaintiff can perform any work considering the RFCs provided by plaintiff's treating physicians. Because the ALJ did not give proper deference and weight to the treating physicians' opinions a remand for redetermination of plaintiff's RFC under the correct standard is required in this case.

## CONCLUSION

Plaintiff's [10] motion for judgment on the pleadings is granted and the Commissioner's [15] cross-motion is denied. The case is remanded for further administrative proceedings consistent with this decision.

**SO ORDERED.**

s/ BMC

U.S.D.J.

Dated: Brooklyn, New York
July 5, 2012